FILED

SEP 23 2013

RICHARD W. WIEKING
CLERK U.S.
DISTRICT COURT
DISTRICT OF CALIFORNIA

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| COLLIN LEONG | ) |
| | ) |
| *Defendant(s)* | ) |

Case No.

3   13   71177

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 13, 2013 _____ in the county of _____ San Francisco _____ in the
_____ Northern _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 United States Code § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |
| 21 United States Code § 846 | Conspiracy to Possess a Controlled Substance with Intent to Distribute |
| | Maximum Penalties: 20 years' imprisonment, $1 million fine; lifetime supervised release, with a minimum of 3 years' supervised release; $100 special assessment |

This criminal complaint is based on these facts:

Please see attached affidavit of DEA SA Jared Lindley in support of Complaint.

(approved as to form ~~KB~~ AUSA Kevin Barry)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jared Lindley, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/23/2013

_____
*Judge's signature*

City and state: _____ San Francisco California _____        Hon. Nathanael Cousins, U.S. Magistrate Judge
*Printed name and title*

1 - MTJ2

## AFFIDAVIT OF DEA SPECIAL AGENT JARED LINDLEY
## IN SUPPORT OF A CRIMINAL COMPLAINT AND
## APPLICATION FOR SEARCH WARRANTS

I, Jared Lindley, having been duly sworn upon oath, hereby depose and state:

### INTRODUCTION

1.      I submit this Affidavit in support of a Criminal Complaint charging Dr. Collin

LEONG with distribution of controlled substances, specifically oxycodone and hydrocodone, in

violation of Title 21, United States Code, Section 841(a)(1), and with conspiracy to distribute

controlled substances, in violation of Title 21, United States Code, Section 846.

2.      I also submit this Affidavit in support of an application for a warrants to search

the following locations:

    a.  929 Clay Street, Suite 301, San Francisco, CA 94607, **Subject Premises # 1**;

    b.  1842 Noriega Street, San Francisco, CA 94122, **Subject Premises # 2**; and

    c.  130 Professional Center Parkway, San Rafael, CA 94903, **Subject Premises #
        3** (collectively, the "**Subject Premises**").

3.      The purpose of the search is locate and seize evidence, fruits, and

instrumentalities of and property used in committing violations of 21 U.S.C. §§ 846 (conspiracy

to possess with intent to distribute controlled substances) and 841(a)(1) (distribution and

possession with intent to distribute controlled substances).  The government requests authority to

enter and search the entire property of the **Subject Premises**, including residences and buildings,

garages, vehicles, and persons located on the property.

4.      The **Subject Premises** are described in more detail and depicted in Attachments A1-A3, which are attached hereto and incorporated by reference herein. The items to be searched for and seized are more specifically described in Attachments B and B-1.

5.      Information that I have collected in the course of this investigation establishes probable cause to believe that evidence of violations of 21 U.S.C. §§ 846 (conspiracy to possess with intent to distribute controlled substances) and 841(a)(1) (distribution and possession with intent to distribute controlled substances) will be found at the **Subject Premises**.

6.      The facts stated in this Affidavit are based on my personal knowledge, on my review of reports prepared by other law enforcement officers and records prepared by others, and on conversations I have had with other law enforcement officers and witnesses involved in this investigation. I have not set forth each and every fact learned during the course of this investigation in this Affidavit. Rather, I have set forth only those facts that I believe are necessary to support the lawful arrest of the individual listed in this Affidavit and the search of the **Subject Premises**. Unless otherwise indicated, where actions, conversations and statements are related herein, they are related in substance and in part only.

## AGENT BACKGROUND

7.      I am an investigative or law enforcement officer of the United States as defined in Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 21, United States Code.

8.      I have been employed by the Drug Enforcement Administration (DEA) as a Special Agent since 2012 and am currently assigned to the San Francisco Field Division, Oakland Resident Office, where I am assigned to the Tactical Diversion Squad. While serving

as a Special Agent for the DEA, I have participated in investigations of illicit drug trafficking organizations. Prior to working as a DEA Special Agent, I attended and graduated from the DEA Basic Agent Training Program in Quantico, Virginia. At the DEA Basic Agent Training Program, I received several hundred hours of comprehensive, formalized instruction in the recognition, distribution, manufacturing, and packaging of controlled substances, as well as money laundering techniques, asset forfeiture, and the diversion of pharmaceutical drugs.

9.      Prior to attending the DEA Basic Agent Training Program, I was employed with the Lawrence Police Department as a Detective for five years and with the Indiana University Police Department as a Patrol Officer for five years. Prior to working as a Patrol Officer, I attended The Indiana Law Enforcement Training Academy where I received several hundred hours of comprehensive, formalized instruction in the duties of a patrol officer, and in state and municipal law.

10.     I have spoken to, and worked with, more experienced federal, state, and municipal agents and officers in connection with my work as a DEA Special Agent, Lawrence Police Detective, and an Indiana University Police Officer. In the course of my investigative experience as a DEA Special Agent, I have developed experience in the use of confidential informants, wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. The investigations in which I have participated have included such issues as the possession with intent to distribute and distribution of controlled substances, the conducting of monetary transactions involving the proceeds of specified unlawful activities and use of monetary instruments to launder those proceeds, and conspiracies associated with criminal narcotics offenses.

3

## APPLICABLE LAW

11.     Title 21, United States Code, Section 841 prohibits a person from manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance.  The elements of that offense are that the defendant:

       a.  knowingly manufactured, distributed, dispensed, or possessed with the intent to manufacture, distribute, or dispense,

       b.  a controlled substance.

12.     Title 21, United States Code, Section 846 prohibits a person from conspiring to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.  The elements of that offense are as follows:

       a.  There was an agreement between two or more persons to manufacture, distribute, dispense, or possess with the intent to manufacture, distribute, or dispense, a controlled substance; and

       b.  The defendant entered into the conspiracy knowing at least one of its objects and intending to help accomplish it.

## THE CONTROLLED SUBSTANCES IN THIS INVESTIGATION

13.     Opioid pain relievers are the most commonly abused pharmaceuticals because of the euphoria they induce.  Opioid pain relievers include Oxycodone, Hydrocodone, Codeine, Fentanyl, Hydromorphone, Morphine, and Methadone, among others.  The two opioid pain relievers most mentioned in this affidavit are oxycodone and hydrocodone.

14.     Oxycodone is a Schedule II controlled substance most commonly prescribed for moderate to severe pain.  Its placement on Schedule II indicates that it has a recognized medical use – unlike Schedule I drugs such as heroin, cocaine, LSD, etc. – but it also has a high potential

4

for abuse. Brand names for oxycodone include OxyContin, Percocet, and Percodan. OxyContin has become among the most commonly prescribed brand-name oxycodone pills because OxyContin oral tablets contain a controlled release formulation of the drug. However, illicit users of OxyContin can defeat the time release formulation by crushing the drug and snorting the powder, by freebasing it, or by preparing it for intravenous injection. Oxycodone pills or tablets are nicknamed "Oxy" and "OCs" and sell on the street for approximately $1.00 per mg, meaning a 30 mg tablet would sell for approximately $30, while an 80mg tablet would sell for up to $80.

15. Hydrocodone is a Schedule III drug most commonly used for moderate to moderately severe pain and is the most frequently prescribed opiate in the United States. Its placement on this Schedule indicates a potential for abuse less than that of Schedule II drugs. Brand names include Norco, Vicodin and Lortab. Hydrocodone is the number one prescribed and abused pharmaceutical drug in the United States and sells on the street from $1.00 to $3.00 per 5mg; the price goes up with the strength.

## FACTS ESTABLISHING PROBABLE CAUSE

### I. CASE OVERVIEW

16. The Oakland Drug Enforcement Administration (DEA) Oakland Resident Office (ORO) Tactical Diversion Squad (TDS) received information from the San Francisco Police Department (SFPD) that Rashid ISLAM (a/k/a Kevin Kenneth WADE) was recruiting homeless people to obtain prescriptions for oxycodone from Dr. Collin LEONG in San Francisco. These people would then get their prescriptions filled, and in exchange for payment, would turn over the medication to ISLAM. A search of ISLAM's residence revealed hundreds of empty prescription bottles for oxycodone, all of which were prescribed by LEONG.

17.     Further investigation, detailed below, revealed that LEONG has been issuing prescriptions for narcotic painkillers, such as oxycodone and hydrocodone, in exchange for cash, and without any medical evaluation or justification. In addition to prescriptions issued to the people ISLAM recruited, LEONG issued prescriptions for oxycodone and hydrocodone under the names of numerous people provided to LEONG by an undercover agent. LEONG sold those prescriptions to the undercover agent without ever seeing the people for whom the prescriptions were issued, let alone providing any medical examination or diagnosis.

## II.     SURVEILLANCE AND ARREST OF ISLAM BY SFPD

### A.     January 18, 2013 Surveillance at Subject Premises # 1 and the 450 Sutter Street Pharmacy

18.     On January 18, 2013, SFPD Officer Carla Hurley conducted surveillance of ISLAM with SFPD Inspector Lew, SFPD Officer Ravano, and SFPD Officer Perdomo. Officers observed ISLAM sitting in his vehicle inside of the Citibank parking lot at the Northwest corner of 26th and Noriega Streets in San Francisco. ISLAM was parked outside of the LEONG's office located at 1842 Noriega Street, San Francisco, CA. Officers then observed ISLAM proceeding to Stockton and Post Streets. They observed ISLAM in the area for approximately one hour, sitting in his vehicle parked on that corner. ISLAM was on his phone almost the entire time.

19.     Officer Hurley was out of her vehicle and sitting down on the steps across the street on Stockton (the Levi's Store) with a direct view of ISLAM's car. Two black males and a black female sat down next to Officer Hurley. The two black males were identified as Kenneth CLARK and Irving BROWN. The black female asked BROWN if he was going to Pittsburg today. BROWN stated that he wasn't and that he was going up here and pointed towards 450 Sutter Street. The black female stated something to the effect of "I was at 450 the other day but

6

they were out." As discussed below, the reference to "450" was to the pharmacy located at 450 Sutter Street. 450 Sutter Street is the address of a medical office building that holds a number of physicians' and dentists' offices. There is also a pharmacy on site.

20.     Officer Hurley observed that the people sitting next to here were talking about ISLAM and pointing toward his vehicle. The female then stated something to the effect of, "I wonder how much he will pay us today; you never know with him."

21.     SFPD Officers observed a third black male adult in his 50's, 6'2", thin build, wearing a black leather coat begin to call over to the three subjects sitting next to Officer Hurley. He said something to the effect of, "C'mon go over there so he can pay you."

22.     Officer Hurley watched as the three individuals got up and went towards ISLAM's car. ISLAM exited his vehicle and greeted them. ISLAM then appeared to hand BROWN and CLARK some money. The female entered the backseat of ISLAM's car, and a fourth black male (in his 50's, 5'7" wearing a beige baseball cap) entered the passenger seat. Officer Hurley did not see where the fourth black male came from.

23.     BROWN, CLARK, and the unknown black male with the leather jacket then entered 450 Sutter Street, where SFPD Officer Ravano followed them. BROWN and CLARK had prescriptions filled at the pharmacy in the building. Officer Hurley later discovered that the prescriptions were for 180 oxycodone pills at 30 mg per pill. The third black male with the leather jacket did not get a prescription filled; it appeared that he only escorted the others to the pharmacy and back to ISLAM's car. After going to ISLAM's car, BROWN and CLARK walked away, and the third black male with the leather jacket entered ISLAM's vehicle.

**B.** **January 24, 2013 Surveillance at Subject Premises # 1 and at 450 Sutter Street, San Francisco**

24. On January 24, 2013, Officer Hurley conducted surveillance on ISLAM again and followed him to the 1000 block of Clay Street in San Francisco, where he entered the medical facility at 929 Clay Street. After going to the 3rd floor and entering LEONG's medical office, **Subject Premises # 1**, ISLAM stayed inside for approximately one hour. When he exited, he drove to 450 Sutter Street and parked outside of the building. Officer Hurley went upstairs to the pharmacy at 450 Sutter Street and observed a black male with a leather jacket waiting outside of the pharmacy. He was talking to two other black male adults. One was approximately 6'2", in his 40's, bald head, 200 lbs wearing a black hooded sweatshirt and blue jeans. The other black male was approximately 6'1", in his 50's, wearing a black hat. They were all talking to each other. Officer Hurley watched as the black male wearing the sweatshirt left and exited the building. A few minutes later, the other two black males got into the elevator with Officer Hurley. Once in the elevator, the black male wearing the hat handed a paper bag to the black male with the leather jacket. The black male with the leather jacket took a pill bottle out of the bag and put it into his right jacket pocket. When they exited the building, the black male with the hat left the area and the black male with the leather jacket entered ISLAM's vehicle. Approximately two minutes later, Officer Hurley watched as ISLAM exited his vehicle and opened the hood of his car. He opened a lid of some kind from the area closest to the driver's side dashboard and placed something under the lid. ISLAM reentered his vehicle and then dropped off the black male with the leather jacket off at Jones and O'Farrell Streets.

25. Surveillance units continued following ISLAM, who then travelled to Oakland, where he resided. ISLAM waited in the area of 151 2nd Street (the Party Warehouse parking lot) for approximately one hour. It appeared that he was waiting for someone. ISLAM then went

8

back to the area where he lives and parked in the parking lot on Madison between 14th and 15th Streets. Officer Hurley watched as he opened the hood of his vehicle. He lifted what appeared to be some kind of lid off of the area closest to the driver's side dashboard. ISLAM then pulled three pill bottles out of this area along with some money and placed them into his coat pockets. He picked up several small items (possibly pills) and also placed them into his pockets. ISLAM then went towards the back of the parking lot and furtively looked around as if to see if anyone was watching him. Officer Hurley lost sight of him. Approximately 5 minutes later, ISLAM exited the parking lot holding a green bag in his hands. Officer Hurley watched ISLAM enter his apartment building. Officer Hurley went to the back of the parking lot to see if ISLAM discarded or concealed anything towards the back of the lot and observed a black female sitting in a black Lexus sedan parked in the same area where ISLAM had been. The black female pulled away shortly afterwards. Officer Hurley suspect that the black female and ISLAM conducted a narcotics transaction and that the green bag was given to him by her and contained either proceeds from narcotics or narcotics.

## C.   ISLAM'S Arrest on February 5, 2013

26.   Based on the information developed in their investigation, including the facts set forth above, on January 31, 2013, the SFPD obtained a warrant from the San Francisco Superior Court for a search of ISLAM's person, his vehicle, and his residence in Oakland.

27.   On February 5, 2013, SFPD Officers Hurley, Ravano, Perdomo, Jones and SFPD Inspector Lew were conducting surveillance on ISLAM. Surveillance units followed ISLAM to the 400 block of Sutter Street where he parked across from 450 Sutter Street at approximately 1:00 pm. Officer Jones went upstairs to the pharmacy and observed a person identified as Aaron

9

SHEPARD waiting outside of the pharmacy, talking to a black male adult who was never identified.

28.     Approximately 5 minutes later, Officer Hurley watched as SHEPARD exited the medical building at 450 Sutter Street and approached ISLAM's vehicle. Officer Hurley watched as ISLAM opened the driver's side door and SHEPARD hunched over into the vehicle. SHEPARD then walked back across the street towards the medical building. At the same time, Officer Hurley watched as ISLAM placed what appeared to be a pharmacy bag under the hood of his vehicle, closest to the dashboard.

29.     SHEPARD reentered 450 Sutter Street, and approximately ten minutes later, he approached ISLAM's vehicle once again. Both ISLAM and SHEPARD then went out of view inside of the alcove east of the UGG store on Sutter Street. ISLAM then entered a Thai Restaurant east of 450 Sutter Street, and SHEPARD walked westbound on Sutter Street.

30.     When ISLAM exited the Thai restaurant, SFPD Inspector Lew watched as he pulled a pharmacy bag and one pill bottle (separated) out of his right jacket pocket and placed the pill bottle into the bag. ISLAM entered his vehicle and began driving west on Sutter Street. Officers then conducted a traffic stop of ISLAM at Sutter and Mason Street and executed the search warrant on ISLAM's person and vehicle.

31.     Officer Hurley opened the hood of ISLAM's vehicle. Underneath a plastic lid that appeared to be a protective layer over the engine immediately next to the driver's side dashboard, she seized 180 oxycodone 30 mg pills prescribed to an individual with the initials A.W. and 180 oxycodone 30 mg pills prescribed to an individual with the initials M.D. The pills were in pill bottles inside of a pharmacy bag with "Four Fifty Sutter Pharmacy" imprinted on it. There was also a prescription receipt dated February 4, 2013 and two other label receipts for the

10

above prescriptions inside of the bag. Both pill bottles were labeled with "Four Fifty Sutter Pharmacy."

32.    Officer Hurley also seized the following items from the same compartment under the vehicle's hood:

- a handwritten prescription for 180 oxycodone 30 mg pills to Aaron SHEPARD;

- a handwritten prescription prescribing Promethazine with Codeine to Rashid ISLAM; and

- a receipt from Sunshine Pharmacy dated February 2, 2013 for a prescription for ISLAM.

33.    Officer Rosaia searched ISLAM pursuant to the warrant and seized 178 oxycodone 30 mg pills prescribed to an individual with the initials R.S. and 81 hydrocodone pills prescribed to ISLAM from Sunshine Pharmacy in South San Francisco.

34.    Officer Hurley then placed ISLAM under arrest.

35.    At approximately 3:09 pm that same day, Officer Hurley, Inspector Lew, and SFPD Officers Ravano, Perdomo, Edison, and Byrne went to 185 15th St Apt #2 in Oakland to serve the search warrant at ISLAM's residence.

36.    Inspector Lew seized the following items from ISLAM's bedroom:

- Hundreds of empty pill bottles (enough to fill 3 large garbage bags) inside of ISLAM's bedroom closet; all the labels were for numerous different individuals, mostly for 180 oxycodone 30 mg pills.

- A plastic grey container on ISLAM's bed containing hundreds of pharmacy receipts for various different prescriptions prescribed to numerous different

11

people as well as three California ID cards that didn't belong to him and a Medical marijuana card for someone else.

- 6 blank prescription pads for various doctors.
- A stack of business cards for Dr. Collin LEONG.
- A stack of prefilled out prescriptions with LEONG's information on it. The majority of the prescriptions were dated in January 2013.

37.    Officer Perdomo seized the following from the top shelf of ISLAM's closet:

- Numerous Medical Patient Information Forms prefilled with patient names and date of births inside of manila folders, all index tabbed by patient name.
- Numerous Medi-Cal Envelopes.
- 3 letter size envelopes labeled Lab Corp filled with hundreds of Lab Corp test result sheets for various different patients (mostly with Asian surnames). There was no postage attached to these envelopes.
- A stack of business cards for Rationale Consultants with ISLAM's name on them.
- A piece of paper with what appeared to be numerous "practice signatures" of LEONG's name.

38.    SFPD Officer Hurley seized the following from ISLAM's bedroom:

- 109 Hydrocodone pills prescribed to an individual with the initials "D.L."
- 117 Hydrocodone pills prescribed to ISLAM.
- 29 Hydrocodone pills prescribed to an individual with the initials "R.H."
- 112 Hydrocodone pills prescribed to an individual with the initials "E.S."
- Promethazine with Codeine syrup prescribed to the individual with the initials "E.S."

• Promethazine with Codeine syrup prescribed to ISLAM.

39.     With respect to the hundreds of empty prescription pill bottles seized from
ISLAM's apartment on February 5, 2013, all of the bottles were for oxycodone, and all of the
prescriptions were written by LEONG. Although there were some pill bottles from prescriptions
beyond this period, the vast majority of pills were from prescriptions issued between September
2012 and January 2013. Based on the labels, it appears there were over 56,000 30 milligram
oxycodone pills in the bottles. At a street value of $1 per milligram, that represents well over
$1.5 million in oxycodone – all prescribed by LEONG.

40.     ISLAM pleaded guilty to conspiracy to possess with intent to distribute controlled
substances, specifically, oxycodone, and on September 13, 2013, Judge Alsup sentencing him to
a term of six years in prison.

**D.      SHEPARD'S Interview By SFPD on February 5, 2013**

41.     Officers with the SFPD detained and interviewed Aaron SHEPARD as ISLAM
was being taken into custody on February 5, 2013. SHEPARD was interviewed by Inspector
Martinovich and Officer Jones at the Tenderloin District Office. During the interview
SHEPARD waived his *Miranda* rights and made the following statements:

- SHEPARD stated he worked for Dr. Collin LEONG by escorting LEONG's
  "patients" to the pharmacy.

- SHEPARD stated the patients would never go to LEONG to receive the
  prescriptions. SHEPARD stated he or ISLAM would pick up the prescriptions
  and give them to the patients to fill.

- SHEPARD stated he makes sure that the patients fill their prescriptions for their
  medication and that they give the medication back to him before they leave.

13

- SHEPARD stated he would then take the medication to Rashid ISLAM after it was obtained at the pharmacy.

- SHEPARD stated ISLAM pays him a couple hundred dollars escorting patients to the pharmacy.

- SHEPARD stated the doctor (LEONG) also pays him money for escorting patients to the pharmacy. SHEPARD stated LEONG would give him a personal check once a week.

- SHEPARD stated ISLAM or LEONG would call up each day and let him know the location to meet the patients and how many patients would need to be taken to the pharmacy.

- SHEPARD stated that he picked up prescriptions from LEONG personally on February 5, 2013 before escorting people to the Four-Fifty Sutter Pharmacy and giving the filled prescriptions to ISLAM.

- SHEPARD stated he has been escorting people to the pharmacy and receiving their prescription medication for approximately seven months.

- SHEPARD stated he began working part-time as security for LEONG before taking people to the pharmacy for LEONG and ISLAM.

## III. SURVEILLANCE OF LEONG – CONNECTION TO SUBJECT PREMISES # 1 AND # 2

### A. May 1, 2013 Surveillance of LEONG's Medical Office Located at 929 Clay Street, Suite 301, San Francisco, CA – Subject Premises # 1

42. On May 1, 2013 at approximately 1:55 p.m. Agents with the Drug Enforcement Administration (DEA), Health and Human Services - Office of Inspector General (HHS-OIG), and the Federal Bureau of Investigation (FBI) positioned themselves in and around the medical

14

office of Dr. Collin LEONG located at 929 Clay Street, Suite 301, San Francisco, CA 94607, **Subject Premises # 1**.

43.    Shortly after establishing surveillance, DEA SA Anthony Guzman and I observed LEONG drive east in the 900 block of Clay Street in his blue 2008 Toyota minivan with California license plate number 6BNA322. An Asian male approximately 20-30 years old was sitting in the passenger seat of the minivan being driven by LEONG. LEONG stopped at the corner of Clay Street and Joice Street, and the younger Asian male got out of the minivan and walked into LEONG's medical office building. The younger Asian male was carrying several folders. LEONG turned onto Joice Street and parked behind his medical office located at 929 Clay Street.

44.    SA Guzman and I observed LEONG walk from Joice Street where he parked his minivan and observed him walk into his medical office building. SA Guzman and I observed LEONG carrying a large blue bag as he walked into his medical office building.

45.    SA Lester Kwok with the FBI observed LEONG, who was carrying a blue bag, walk up the back stairs in the medical office building. SA Kwok observed LEONG walk into a door near the restrooms and walk back out without the blue bag.

46.    After approximately four hours, SA Guzman and I observed LEONG walk out of his medical building at 929 Clay Street and walk to a convenience store at the corner of Stockton Street and Clay Street. I observed LEONG return to his medical office building approximately fifteen minutes later.

47.    SA Guzman and I observed LEONG and a younger Asian male wearing a gray sweatshirt and glasses walk out of the medical office building together. LEONG was carrying a blue bag that looked identical to the blue bag he walked into the medical office with earlier in the

15

day. The younger Asian male was pushing a printer on a dolly. LEONG and the younger Asian

male walked south on Joice Street to the area where LEONG parked his minivan. LEONG

entered his blue Toyota minivan and drove away from the area.

## B. May 6, 2013 Surveillance of LEONG's Medical Office Located at 1842 Noriega Street, San Francisco, CA – Subject Premises # 2

48.     On May 6, 2013, from approximately 9:00 a.m. to 12:00 p.m. Special Agents with

Health and Human Services - Office of Inspector General (HHS-OIG) conducted surveillance at

Dr. LEONG's office located at 1842 Noriega Street, San Francisco, CA 94122, **Subject**

**Premises # 2**.

49.     During the surveillance, the SA's observed several individuals entering and

exiting LEONG's office on Noriega Street. The individuals included LEONG, several elderly

Asian men and women, a white female in professional attire who was carrying a briefcase, and a

white male who was later identified as Dustin DULIN.

50.     DULIN was confirmed to be a patient of LEONG's through the California

Prescription Drug Monitoring Database known as CURES (Controlled Substance Utilization

Review and Evaluation System) database.

## VI. UNDERCOVER PURCHASES OF PRESCRIPTIONS FROM LEONG

### A. Undercover Purchase of Prescriptions from LEONG on July 31, 2013

51.     On July 31, 2013, at approximately 11:30 AM, SA Anthony Guzman, Health and

Human Services/Office of Inspector General (HHS/OIG) SA Blade Bricker, HHS/OIG SA

Jennifer Spaulding, and I met with a Confidential Source, hereafter referred to as CS.[1] During

---

[1] During the course of the investigation, agents learned the CS failed to be fully forthcoming
with all information related to the CS's relationship/business with LEONG. The CS was
discovered meeting with LEONG during an undercover purchase of prescriptions from LEONG

the meeting, the CS placed a recorded phone call to LEONG to set up a time to meet with LEONG to purchase prescriptions of oxycodone and promethazine. The CS spoke with LEONG and arranged to meet with LEONG at LEONG's medical office at 929 Clay Street, San Francisco, CA – **Subject Premises # 1**.

52.     Approximately two hours later, SA Guzman and I observed the CS arrive at LEONG's office located at 929 Clay Street, San Francisco, CA with SA Bricker, who was acting in an undercover capacity. Surveillance units were not able to locate LEONG's blue minivan, bearing California plate 6BNA322.

53.     After waiting for approximately half an hour, SA Guzman and I observed the CS and SA Bricker exit their vehicle and walk inside the medical building at 929 Clay Street, San Francisco, CA to go to LEONG's office in suite 301, **Subject Premises # 1**.

54.     A short time later, SA Guzman and I observed LEONG arrive at 929 Clay Street, San Francisco, CA in the blue minivan bearing California plate 6BNA322. SA Guzman and I observed LEONG was with an unknown Asian female (UAF). SA Guzman and I observed LEONG drop off the UAF and then observed LEONG drive down Joice Street and park his minivan.

55.     SA Guzman and I observed LEONG exit his vehicle and start walking toward his office. SA Guzman and I observed LEONG was wearing a blue button down shirt with a gray vest and gray slacks. We observed LEONG carrying a small white bag and going inside the building at 929 Clay Street, San Francisco, CA.

56.     After LEONG walked inside the medical office, SA Guzman and I could hear via a body wire worn by SA Bricker that LEONG was meeting with the CS and SA Bricker.

on August 13, 2013, discussed below. The CS met with LEONG without any prior agent knowledge or approval.

17

57.     During the meeting with LEONG SA Bricker provided LEONG with a list of five

names. The names included Tommy Miller, Kyle Brown, Jennifer John, Scott Stottlemyer, and

John Lee. LEONG wrote a prescription for 180 dosage unit's (du's) of 30 mg oxycodone and

promethazine with codeine to each name provided. LEONG made a copy of the list of names to

verify the prescriptions in case any pharmacies called about the prescriptions. SA Bricker

purchased all ten prescriptions for $1,000.

58.     After approximately 30 minutes, SA Guzman and I observed the CS and SA

Bricker exit the building and walk over to their vehicle. SA Guzman and I observed the CS and

SA Bricker getting into their vehicle and depart the area.

**B.     Undercover Purchase of Prescriptions from LEONG on August 13, 2013**

59.     On August 13, 2013 at approximately 11:43 a.m. Special Agent (SA) Blade

Bricker with Health and Human Services - Office of Inspector General (HHS-OIG) placed a

recorded telephone call to LEONG to set up a meeting later in the day to purchase prescriptions

for oxycodone. SA Bricker, acting in an undercover capacity, arranged to meet with LEONG at

his medical office located at 929 Clay Street, Suite 301, San Francisco, **Subject Premises #1**,

around 5:00 p.m.

60.     At approximately 4:30 p.m. SA Bricker called LEONG again. SA Bricker let

LEONG know that he was in San Francisco. LEONG instructed SA Bricker to come by as soon

as he could because LEONG had already seen all of his scheduled patients.

61.     Earlier in the afternoon, agents established surveillance in the area of 929 Clay

Street, San Francisco, CA – the building in which **Subject Premises #1** is located. Surveillance

was able to locate LEONG's blue minivan bearing CA registration number 6BNA322 parked on

Joice Street.

18

62.    Approximately thirty minutes later SA Paul Greenhill with the California
Department of Justice - Bureau of Medi-Cal Fraud and Elder Abuse (BMFEA) observed SA
Bricker walking into 929 Clay Street.

63.    SA Bricker met with LEONG for approximately forty minutes. During the
meeting, SA Bricker provided LEONG with a list of five names. The names included John
Miller, Sara Walker, Jennifer James, Scott Stottlemyer, and John Lee. LEONG wrote twelve
total prescriptions for the names provided. LEONG wrote five prescriptions for Soma,[2] five
prescriptions for Norco (hydrocodone), and two prescriptions for 180 du's of oxycodone 30 mg.
SA Bricker paid LEONG $1,000 for all of the prescriptions. SA Bricker was wearing a
video/audio recording during the meeting. The following is a non-verbatim account of the
conversation between SA Bricker and LEONG.

- SA Bricker told LEONG that he has a pharmacy tech to whom he can slip $100 and who
  will make sure that the script gets filled, no questions asked.

- LEONG replied that the problem is that you can sneak it by, but there is someone called
  the D-E-A [LEONG spelled it out] that can go back and look it over. The issue is that
  they have to have records. What records do you have, what documentation?

- SA Bricker told LEONG that he will follow any tips that LEONG can provide him.

- LEONG replied that there is a quote from a famous patriot that said either we hang
  together or we hang separately.

- LEONG told SA Bricker that there is a term called "Diversion," which means that the
  person who picks up the pills is not the one using the pills; that person may be selling it

---

[2] Soma is the brand name for carisoprodol, a heavy sedative and muscle relaxant. Soma is
frequently combined with opioid narcotics, such as oxycodone and hydrocodone, because the
combination allows a user to magnify the effects of the narcotic, and thereby take a smaller dose.

19

to people who are selling pills; it's like being a drug dealer. LEONG stated that he had no doubt that there are people doing the right thing, but the potential is there. That is why they are looking so hard these days. Norco does not show up on the radar like oxy does. You bring in a script of Norco to the pharmacy and they are alright, but you bring in oxy and their eyes get all big.

- SA Bricker suggested doing a couple oxy a month and asked if that would still be on the radar. LEONG said whoever we did that for, if that person had previous x-rays, MRIs, records from other doctors and we have a chart . . . that's the point. Let's say we go further down the road, we actually need to construct some charts. Let's say someone comes in here and says 'Dr. Leong you wrote this prescription for this Mr. LEE can we see his record?' Then they say 'he has pain bad enough to take this, what disease do they have?'

- SA Bricker asked if he should track down a couple of MRIs. LEONG said for that person, if you can get records from that previous doctor [it would be good]. We just need copies, not the actual records. If you have actual evidence of what happened as opposed to just saying that you were in auto accident. Talk is cheap.

- SA Bricker told LEONG that if they stick to the ten names religiously, he can find a contact for MRIs. LEONG replied that if those contacts actually have them, then they can say that they have seen these patients; he has this history and has these problems. Then just make it up. That's why medical records are important. People can walk in and claim that they have all these injuries but you can't make up those lab results. If that patient saw someone else, they can easily contact that doctor. Did you see this patient? That is what the DEA is all about, they got investigators. If they need to track down

20

something, believe me they can track it down. That where things are these days. Just because it goes through, doesn't mean that they aren't looking. If they see something that looks kinda weird they will check it.

- LEONG told SA Bricker, I am glad you understand. Some people look at you, like what are you talking about?

- SA Bricker then explained that he is only working with two other people and they are not going to bring any other people to LEONG. SA Bricker suggested that they can post date the oxy scripts so that they don't fill them all at once. LEONG replied that we just need to back it up.

- SA Bricker stated that he will see what he can do to get the records for LEONG. LEONG said yes, that way when they ask for records he can say 'here it is.' As opposed to, 'I don't think we have it.'

- SA Bricker asked if he can get Soma for five of the people on the list. LEONG asked if SA Bricker is going to take care of him. SA Bricker replied of course he is. LEONG said thank you, not a problem.

- LEONG said sometimes the pharmacies like that [the addition of another drug, like Soma]; if you just go with one thing then the pharmacies start asking how come you guys are just using him for this one thing. SA Bricker asked if that is a normal deal (Somas and Norco going together). LEONG replied that they do.

- SA Bricker began talking about traffic and the time of day and told LEONG that he is not sure what direction he is going. LEONG said that he is going across the Golden Gate Bridge.

21

- LEONG told SA Bricker that he is glad that he [SA Bricker] understands the concept because some people are just greedy. LEONG says that being smart you get to play another day.

- SA Bricker repeated that he only works with two people and not 30, and SA Bricker stated some people will just eat it [pills] like candy. LEONG said then people will start asking 'Where did that stuff come from [meaning pills]?'

- LEONG said he will keep the list [of the people for whom he was writing prescriptions] in case he gets any calls.

64. LEONG was writing prescriptions during the whole conversation.

65. After the meeting, SA Greenhill observed SA Bricker walking out of LEONG's office. SA Bricker drove away from the area and met with SA Guzman and Task Force Officer (TFO) Ryan Kiefer at a pre-determined location. SA Bricker turned over twelve (12) prescriptions that he purchased from LEONG for $1,000.

## V.  SURVEILLANCE OF LEONG ON AUGUST 13, 2013 – CONNECTION TO SUBJECT PREMISES # 3

66. Following the meeting with SA Bricker on August 13, 2013, at approximately 6:45 p.m., SA Greenhill observed LEONG walk out of 929 Clay Street. SA Greenhill observed LEONG lock the gate that covered the front door of 929 Clay Street, and then walk toward his blue Toyota minivan parked on Joice Street. SA Greenhill observed LEONG carrying a bag that contained papers. SA Greenhill described the bag as a black bag with writing on the side that had an open top with carrying handles. SA Greenhill lost sight of LEONG as he walked down Joice Street. SA Greenhill repositioned himself and observed LEONG driving his Toyota minivan from Joice Street onto Sacramento Street.

22

67.     Surveillance agents followed LEONG in his blue minivan to the area of 17th

Avenue and Geary Boulevard. HHS-OIG SA Jennifer Spaulding observed LEONG walk into

Cigarettes R Cheaper located at 5300 Geary Boulevard, San Francisco, CA. SA Guzman noticed

this business had a window display for Western Union. LEONG was inside Cigarettes R

Cheaper for a few minutes before leaving the area in his blue minivan.

68.     Surveillance followed LEONG in his blue minivan to the Dollar Tree located at

825 Francisco Blvd W. San Rafael, CA and to the Safeway located at 950 Las Gallinas Avenue,

San Rafael, CA. LEONG stopped briefly at each location and made small purchases. SA

Spaulding walked past LEONG's blue minivan while it was parked in the Safeway parking lot.

SA Spaulding observed multiple files, folders, a black bag, and a duffel bag in the blue minivan.

69.     After leaving the Safeway, SA Greenhill observed LEONG pull his blue minivan

into the garage of his residence located at 130 Professional Center Parkway, San Rafael, CA,[3]

**Subject Premises # 3**. SA Greenhill observed LEONG park next to a silver Mercedes and close

the garage door before he exited his blue minivan. SA Greenhill observed the numbers 130 in

plain view next to the garage door into which LEONG drove his minivan.

70.     The 2008 blue Toyota minivan with California registration number 6BNA322 is

also registered to Collin LEONG with an address of 130 Professional Center Parkway, San

Rafael, CA 94903.

## VI.     LEONG's INTERVIEW WITH THE CALIFORNIA MEDICAL BOARD ON OCTOBER 9, 2012 – CONNECTION WITH THE SUBJECT PREMISES

71.     On October 9, 2012 LEONG was interviewed by the Medical Board of California.

During the initial stages of the interview LEONG was asked the addresses of the locations where

he practices medicine. LEONG stated his main location is 929 Clay Street, Suite 301, San

---

[3] Despite the name of the street, this is a condominium complex, as seen in Attachment A-3.

23

Francisco, CA 94108, **Subject Premises # 1**. LEONG stated he works out of the Clay Street

Office Monday through Friday from 1:00 p.m. to 5:30 p.m., and alternate Saturdays from 9:00

a.m. to 12:00 p.m. The Medical Board asked LEONG what the address was to his second

location. LEONG responded 1842 Noriega Street, San Francisco, CA 94122, **Subject Premises**

**# 2**. LEONG stated the hours of operation were Monday, Wednesday, and Friday mornings from

9:00 a.m. to 12:00 p.m. and alternate Thursdays from 5:30 p.m. to 7:30 p.m. The Medical Board

also asked LEONG to state his current address. LEONG responded 130 Professional Center

Parkway, San Rafael, CA 94903, **Subject Premises #3**.

## VII.    PROBABLE CAUSE TO BELIEVE THAT EVIDENCE RELATED TO ILLEGAL PRESCRIPTIONS WILL BE FOUND AT THE SUBJECT PREMISES

### A.    Overview of Medicare and Medicaid / Record Keeping Requirements

72.    The Medicare Program is a federally funded health insurance program that

provides health care benefits to certain individuals, primarily the elderly, blind, and disabled. A

Medicare "provider" is a medical professional who submits claims to Medicare for

reimbursement for services and procedures performed on Medicare beneficiaries. To become

Medicare providers, medical doctors or other health care professionals voluntarily enroll and

must complete a provider enrollment application. This provider enrollment application requires

the Medicare provider to certify that he or she is familiar with, and will follow, all Medicare

laws, rules and regulations.

73.    After processing the provider enrollment application, Medicare, through its agents

and contractors, assigns the provider a unique billing number which must be used when billing

Medicare. This unique billing number is also called a provider number, and allows that provider

to submit claims for reimbursement to Medicare. Along with issuing a unique billing number,

24

Medicare and its agents and contractors, issue and/or publish on its Internet websites, provider manuals, bulletins and updates, which explain Medicare's laws, rules and regulations.

74.    Medicare requires providers to keep and maintain patient files for at least five years. Those files must include medical complaints of the beneficiary, dates of service, physical examinations, symptoms, diagnoses, plans of treatments, procedures and services performed, results of procedures and services performed, data and results, and the identity of the performer. Medicare requires the information in these patient files to be true and accurate. Patient files are the primary source of information Medicare uses to determine whether medical procedures and services were performed and, if performed, whether those services were reasonable and necessary. Medicare has the regulatory authority to conduct audits and request records from its providers at any time.

75.    Medi-Cal is California's Medicaid program. This is a public health insurance program which provides needed health care services for low income individuals. Medi-Cal is financed equally by the State of California and the federal government. Medi-Cal benefits include a pharmacy benefits division which serves 6.8 million beneficiaries in California.

76.    Similar to Medicare, Medi-Cal voluntarily enrolls health care professionals who must complete a provider enrollment application. The application requires that the Medi-Cal provider follow all rules and regulations, including the record-keeping requirements.

77.    The Medicare and Medicaid programs, as well as virtually every other health care benefit program, require that claims for services report the type of service by use of the American Medical Association's Current Procedural Terminology ("CPT") Codes. CPT Codes are intended to accurately identify, simplify, and standardize billing for medical services. Related services are assigned sequential CPT Codes with differing levels of complexity. Among

25

the most commonly billed codes are two series of five evaluation and management ("E&M")

codes that apply to office or certain other outpatient visits. CPT Codes 99201, 99202, 99203,

99204, and 99205 are used for new patients, and 99211, 99212, 99213, 99214, and 99215 are

used for established patients. As the code number becomes higher, the level of service and the

reimbursement proportionally increase.

## B.   To the Extent That LEONG Has Records to Support Narcotic Prescriptions, Those Records Are Likely to be Fraudulent

78.     LEONG is an approved Medicare provider, subject to the reporting requirements

of those programs. As seen in LEONG's discussion with SA Bricker regarding the need to have

some sort of medical records to support the narcotic prescriptions LEONG issued without

actually seeing them, see ¶¶ 59-65, above, there is probable cause to believe that there will be

documents related to fraudulent prescriptions in the **Subject Premises**.

79.     The individuals whose names SA Bricker provided to LEONG were not the only

non-patients for whom LEONG likely provided prescriptions. The investigation has revealed

that LEONG wrote prescriptions that were filled by people far from the San Francisco Bay Area.

80.     For example, from September 11, 2012 to the present, LEONG prescribed over

200 prescriptions for controlled substances that were filled throughout the Seattle, Washington

area. Of the 200 prescriptions, 47 were issued to Washington Medicaid beneficiaries, individuals

who, by definition, are not residents of the Bay Area.

81.     In addition, from April 1, 2011 to April 8, 2013, LEONG prescribed over 44

prescriptions for controlled substances that were filled throughout the state of Nevada.

82.     Also, from March 19, 2009 to March 27, 2013 LEONG prescribed over 162

prescriptions for controlled substances that were filled throughout the state of Arizona.

83.     The investigation of Rashid ISLAM demonstrated that LEONG wrote a significant number of prescriptions oxycodone for people who filled the prescriptions in exchange for payment and then provided the drugs to ISLAM. As discussed above, see ¶¶ 36-39, agents discovered hundreds of prescription bottles for oxycodone from LEONG prescriptions in ISLAM's apartment. Further, Aaron SHEPARD indicated to officers that he was paid by LEONG and ISLAM to give individuals prescriptions written by LEONG to pharmacies, to ensure that those individuals filled the prescriptions, and to give the drugs to ISLAM. *See* ¶ 41, above. Finally, SA Bricker purchased 22 prescriptions from LEONG for people whom LEONG never saw. To the extent that LEONG has any medical records related to the individuals whose names SA Bricker gave to LEONG, related to the individuals identified on the pill bottles found in ISLAM's apartment, or related to the individuals from other states who filled LEONG prescriptions, those records are likely to be fraudulent. To the extent that these records contain any of the CPT codes required by Medicare and Medi-Cal, those codes are likely to be fictitious.

84.     The fact that fraudulent records for individuals for whom LEONG prescribed narcotics are likely to be found at the **Subject Premises** is further supported by the fact that during the February 5, 2013 search of ISLAM's residence, officers found numerous Medi-Cal patient information forms prefilled with patient names and date of births, all index tabbed by patient name; numerous Medi-Cal envelopes; and hundreds of laboratory test result sheets for various patients. *See* ¶¶ 36-37, above.

## C.      There Are Likely to Be Financial Records At the Subject Premises, As Shown By Western Union Subpoena Results

85.     Based on my training and experience, and speaking with other Agents, I know that drug dealers often use money wire transfer services such as Western Union and MoneyGram to receive payments from customers.

27

86. On February 11, 2013, SA Anthony Guzman issued an administrative subpoena to Western Union Financial Services requesting records including incoming and outgoing money transfers, copies of wire transfer tickets, money orders, prepaid cards, quick cash, e-bill and online banking information covering the period from January 1, 2011 to February 11, 2013 related to the following names and addresses, all of which are associated with Collin LEONG M.D.

87. On March 1, 2013, SA Guzman received the requested results covering the time frame from January 3, 2011 to February 21, 2013. There were approximately 235 transactions to and from approximately 58 individuals totaling $39,708.23. Of those 58 individuals, approximately 47 were identified as patients of LEONG (including LEONG himself). The Payee in all cases but one was Dr. Collin LEONG. The one instance where that differed was on January 8, 2013 when Collin LEONG M.D. sent $622.23 to Wells Fargo Dealer Services. The chart below summarizes the result of the Western Union Subpoena:

| Sender Name | City | State | Total |
|---|---|---|---|
| ALEX MILLER | RENO | NV | 450.00 |
| AMANDA SAFFORD | FAIRFIELD | CA | 100.00 |
| ANGELO MILLER | SAN FRANCISCO | CA | 100.00 |
| ANITA STEIN | LAS VEGAS | NV | 100.00 |
| | VISAILA | CA | 100.00 |
| ANTHONY EVANS | FLAGSTAFF | AZ | 1,350.00 |
| | SEATTLE | WA | 400.00 |
| APRIL MARKS | NC | CA | 450.00 |
| | RANCHO CUCAMONGA | CA | 90.00 |
| APRIL WILLIAMS | PASADENA | TX | 100.00 |
| BARBI UWANAWICH | JAMESTOWN | CA | 170.00 |
| BARBIE UWANAMICH | JAMESTOWN | CA | 150.00 |
| BARBIE UWANAWICH | JAMESTOWN | CA | 1,535.00 |

| Sender Name | City | State | Total |
|---|---|---|---|
| | LOS ANGELES | CA | 100.00 |
| BRYAN CAMPBELL | SAN DIEGO | CA | 600.00 |
| CHAZ MARKS | LA JOLLA | CA | 115.00 |
| CHAZZ MARKS | LA JOLLA | CA | 210.00 |
| CHRIS EVANS | OYSTER BAY | NY | 740.00 |
| CHRIS JOHN | FRESNO | CA | 100.00 |
| CHRIS WILLIAMS | PHOENIX | AZ | 100.00 |
| CINDY EPURAIM | HOLLYWOOD | FL | 50.00 |
| COLLIN LEONG | SAN FRANCISCO | CA | 622.23 |
| CRYSTAL LEO | LOS ANGELES | CA | 100.00 |
| DEVONTE BERNSTINE | RICHMOND | CA | 300.00 |
| EDDIE FOR | CHICAGO | IL | 600.00 |
| | NORRIDGE | IL | 100.00 |
| | OAKLAND | CA | 100.00 |
| GABBY MILLER | SAN FRANCISCO | CA | 420.00 |
| GENIE NICHOLAS | HOLLYWOOD | FL | 200.00 |
| GEORGE ADAMS | HOUSTON | TX | 300.00 |
| JAMIE MARKS | CALIFORNIA | CA | 708.00 |
| | LA JOLLA | CA | 575.00 |
| | PHOENIX | AZ | 788.00 |
| | SAN DIEGO | CA | 180.00 |
| JAMIE WILLIAMS | PHOENIX | AZ | 100.00 |
| JANET WILLIAMS | NEW YORK | NY | 150.00 |
| JENNIFER MARKS | ESCONDIDO | CA | 85.00 |
| JILL ENGLE | JAMESTOWN | CA | 75.00 |
| JOHNNY LOEO | NEWORK | CA | 180.00 |
| JON AGSALUD | SAN DIEGO | CA | 190.00 |
| JONATHAN NICHOLAS | MIAMI | FL | 450.00 |
| JUDY MARKS | DALLAS | TX | 100.00 |
| LATONYA WILLIAMS | OAKLAND | CA | 150.00 |
| MARK MILLER | APTOS | CA | 2,816.00 |
| MICHAEL LEE | OAKLAND | CA | 220.00 |
| MICHAEL MARKS | NORTHBROOK | IL | 160.00 |
| MICHAEL MILLER | LAS VEGAS | NV | 150.00 |
| MICHAEL YONKO | OAKLAND | CA | 200.00 |
| NATALIE GUY | ALOHA | OR | 455.00 |
| | BEAVERTON | OR | 400.00 |
| | PORTLAND | OR | 100.00 |
| | SAN FRANSICO | CA | 100.00 |
| | SAN JOSE | CA | 480.00 |

| Sender Name | City | State | Total |
|---|---|---|---|
| PEBBLES MARK | SAN DIEGO | CA | 148.00 |
| PESA THOMPSON | BEVERLY | CA | 320.00 |
| | BOTHELL | WA | 1,010.00 |
| PETER EVANS | OAKLAND | CA | 400.00 |
| RACHEL NICHOLAS | YUCAIPA | CA | 100.00 |
| RICKY MILLER | DENVER | CO | 100.00 |
| ROBBY ADAMS | GARDENA | CA | 200.00 |
| ROSIE ZIKO | GLENDALE | CA | 188.00 |
| SANDIE COSTELLO | DENVER | CO | 100.00 |
| SHARON LEE | SAN FRANCISCO | CA | 870.00 |
| SONIA LOPEZ | ROCKLIN | CA | 500.00 |
| STEPHANIE MARKS | AVENTURA | FL | 100.00 |
| STEVE EVANS | SEATTLE | WA | 600.00 |
| STEVEN EVANS | FLAGSTAFF | AZ | 1812.00 |
| | SAN FRANCISCO | CA | 10,188.00 |
| | SEATTLE | WA | 998.00 |
| STEVEN EVENS | SEATTLE | WA | 400.00 |
| SYLVIA MARKS | HONOLULU | HI | 100.00 |
| | PHOENIX | AZ | 400.00 |
| | SAN DIEGO | CA | 300.00 |
| SYLVIA NICHOLAS | LOMITA | CA | 600.00 |
| TAMMY MARKS | ANAHEIM | CA | 90.00 |
| | SAN DIEGO | CA | 300.00 |
| TIFFANIE MILLER | SAN JOSE | CA | 75.00 |
| TOM BENNCO | OAKLAND | CA | 300.00 |
| TOMMY YONKO | OAKLAND | CA | 100.00 |
| TONY MARKS | PHX | AZ | 95.00 |
| TONY WILLIAMS | SANTA CRUZ | CA | 200.00 |
| TRACI OREAR | SANTA ROSA | CA | 150.00 |
| ZEPHYR WELLS | HAYWARD | CA | 300.00 |
| Grand Total | | | 39,708.23 |

88. The following summary, sorted by largest amount sent, combines and totals the dollar amounts by sender name and couples those individuals with reports of prescriptions filled in LEONG's CURES (Controlled Substance Utilization Review and Evaluation System) reports dated March 13, 2011 through March 13, 2012 and/or January 23, 2012 through January 23, 2013. (The CURES database tracks prescription medication that is dispensed at pharmacies.)

The drugs obtained by the individuals are also noted. The chart combines those individuals with slight name variations, such as "Steve Evans," "Steven Evans," and "Steven Evens," who agents believe to be the same person due to the identifying information provided to Western Union or information obtained via commercial database queries.

| Sender Name | Total | PRODUCT(S) FILLED |
|---|---|---|
| STEVE EVANS aka Anthony EVANS | $15,748.00 | OXYCODONE HCL |
| MARK MILLER | $2,816.00 | APAP/HYDROCODONE BITARTRATE ALPRAZOLAM |
| JAMIE MARKS aka WILLIAMS | $2,351.00 | APAP/HYDROCODONE BITARTRATE ZOLPIDEM TARTRATE TRIAZOLAM DIAZEPAM CARISOPRODOL |
| BARBIE UWANAWICH | $1,955.00 | APAP/HYDROCODONE BITARTRATE ALPRAZOLAM DIAZEPAM |
| NATALIE GUY | $1,535.00 | |
| PESA THOMPSON | $1,330.00 | APAP/HYDROCODONE BITARTRATE OXYCODONE HCL DIAZEPAM |
| SHARON LEE | $870.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM LORAZEPAM |
| EDDIE FOR | $800.00 | APAP/HYDROCODONE BITARTRATE |
| SYLVIA MARKS 04/10/1980 | $700.00 | APAP/HYDROCODONE BITARTRATE PHENTERMINE HCL ZOLPIDEM TARTRATE DIAZEPAM |
| CHRIS EVANS | $740.00 | OXYCODONE HCL |
| COLLIN LEONG | $622.23 | HYDROCODONE AND CHLORPHENIRAMINE PO VICODIN ES TRIAZOLAM |
| BRYAN CAMPBELL | $600.00 | APAP/HYDROCODONE BITARTRATE ZOLPIDEM TARTRATE DIAZEPAM |
| SYLVIA NICHOLAS | $600.00 | APAP/HYDROCODONE BITARTRATE OXYCODONE HCL CODEINE/PROMETHAZINE DIAZEPAM |

| Sender Name | Total | PRODUCT(S) FILLED |
|---|---|---|
| APRIL MARKS | $540.00 | APAP/HYDROCODONE BITARTRATE ZOLPIDEM TARTRATE |
| SONIA LOPEZ | $500.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM |
| ALEX MILLER | $450.00 | APAP/HYDROCODONE BITARTRATE OXYCODONE HCL DIAZEPAM |
| JONATHAN NICHOLAS | $450.00 | |
| GABBY MILLER | $420.00 | |
| PETER EVANS | $400.00 | APAP/HYDROCODONE BITARTRATE OXYCODONE HCL |
| TAMMY MARKS | $390.00 | APAP/HYDROCODONE BITARTRATE |
| CHAZ MARKS | $325.00 | |
| DEVONTE BERNSTINE | $300.00 | OXYCODONE HCL DIAZEPAM |
| GEORGE ADAMS | $300.00 | APAP/HYDROCODONE BITARTRATE |
| TOM BENNCO | $300.00 | APAP/HYDROCODONE BITARTRATE |
| ZEPHYR WELLS | $300.00 | APAP/HYDROCODONE BITARTRATE OXYCODONE HCL CODEINE/PROMETHAZINE CARISOPRODOL |
| MICHAEL LEE | $220.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM |
| ANITA STEIN | $200.00 | APAP/HYDROCODONE BITARTRATE PHENTERMINE HCL OXYCODONE HCL LORAZEPAM DIAZEPAM |
| GENIE NICHOLAS | $200.00 | |
| MICHAEL YONKO | $200.00 | APAP/HYDROCODONE BITARTRATE |
| ROBBY ADAMS | $200.00 | APAP/HYDROCODONE BITARTRATE OXYCODONE HCL CARISOPRODOL |
| TONY WILLIAMS | $200.00 | APAP/HYDROCODONE BITARTRATE |
| JON AGSALUD | $190.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM |
| ROSIE ZIKO | $188.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM |
| JOHNNY LOEO | $180.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM |

| Sender Name | Total | PRODUCT(S) FILLED |
|---|---|---|
| MICHAEL MARKS | $160.00 | APAP/HYDROCODONE BITARTRATE<br>PHENTERMINE HCL<br>ZOLPIDEM TARTRATE<br>DEXTROAMPH SACC/AMPH SP/DEXTROAM S<br>LORAZEPAM<br>AMPHETAMINE SALT COMBO |
| JANET WILLIAMS | $150.00 | APAP/HYDROCODONE BITARTRATE<br>CARISOPRODOL<br>ALPRAZOLAM |
| LATONYA WILLIAMS | $150.00 | OXYCODONE HCL<br>APAP/HYDROCODONE BITARTRATE |
| MICHAEL MILLER | $150.00 | APAP/HYDROCODONE BITARTRATE<br>ALPRAZOLAM |
| TRACI OREAR | $150.00 | APAP/HYDROCODONE BITARTRATE |
| PEBBLES MARK | $148.00 | |
| AMANDA SAFFORD | $100.00 | |
| ANGELO MILLER | $100.00 | APAP/HYDROCODONE BITARTRATE<br>OXYCODONE HCL |
| APRIL WILLIAMS | $100.00 | |
| CHRIS JOHN | $100.00 | APAP/HYDROCODONE BITARTRATE |
| CHRIS WILLIAMS | $100.00 | APAP/HYDROCODONE BITARTRATE<br>DIAZEPAM<br>TRIAZOLAM<br>ZOLPIDEM TARTRATE |
| CRYSTAL LEO | $100.00 | APAP/HYDROCODONE BITARTRATE<br>DIAZEPAM<br>ALPRAZOLAM |
| JUDY MARKS | $100.00 | |
| RACHEL NICHOLAS | $100.00 | APAP/HYDROCODONE BITARTRATE |
| RICKY MILLER | $100.00 | APAP/HYDROCODONE BITARTRATE<br>ALPRAZOLAM<br>CARISOPRODOL |
| SANDIE COSTELLO | $100.00 | APAP/HYDROCODONE BITARTRATE |
| STEPHANIE MARKS | $100.00 | |
| TOMMY YONKO | $100.00 | APAP/HYDROCODONE BITARTRATE<br>DIAZEPAM<br>PHENTERMINE HCL |
| SYLVIA MARKS | $100.00 | PHENTERMINE HCL |
| TONY MARKS | $95.00 | |
| JENNIFER MARKS | $85.00 | APAP/HYDROCODONE BITARTRATE |

| Sender Name | Total | PRODUCT(S) FILLED |
|---|---|---|
| JILL ENGLE | $75.00 | APAP/HYDROCODONE BITARTRATE DIAZEPAM TRIAZOLAM ALPRAZOLAM |
| TIFFANIE MILLER | $75.00 | PHENTERMINE HCL |
| CINDY EPURAIM aka EPHRAIM | $50.00 | PHENTERMINE HCL DIAZEPAM |
| Grand Total | $39,708.23 | |

89. The fact that these Western Union funds transfers are likely related to improper prescriptions is further supported by the fact that two of the individuals – Anita Stein and Alex Miller – filled LEONG prescriptions in the state of Nevada and sent money via Western Union to LEONG.

90. In addition, two of the individuals who sent money to LEONG filled LEONG prescriptions in the state of Arizona during the time period of March 19, 2009 to March 27, 2013: Jamie Marks and Chris Williams.

91. As discussed above, following the August 13, 2013 meeting with SA Bricker during which SA Bricker paid LEONG $1,000 for twelve prescriptions written to individuals whom LEONG never saw as patients, agents observed LEONG leave his office at 929 Clay Street, San Francisco, CA 94607, **Subject Premises # 1**, and travel to his residence at 130 Professional Center Parkway, San Rafael, CA 94903, **Subject Premises # 3**. On the way, agents observed LEONG stop for a few minutes at a store that had a window display for Western Union. *See* ¶ 67, above. During another stop by LEONG on the way to **Subject Premises # 3**, agents observed multiple files, folders, a black bag, and a duffel bag in LEONG's vehicle. *See* ¶ 68, above.

**VII.   AGENTS DEVELOP A LIST OF "SUSPECT PATIENTS" OF LEONG**

92.     As discussed above, there is probable cause to believe that LEONG sold

prescriptions for narcotics such as oxycodone and hydrocodone for money, without seeing the

individuals for whom he wrote the prescriptions and with no medical diagnosis associated with

the prescriptions.  Although LEONG also has apparently legitimate patients, agents have been

able to determine a number of people who filled prescriptions written by LEONG that were

likely written solely in exchange for payment, and with no medical justification.  These

individuals will be referred to as the "Suspect Patients."

93.     Agents determined who the "Suspect Patients" were by:  (1) reviewing the names

on the hundreds of empty prescription bottles seized by officers during the February 5, 2013

search of ISLAM's apartment; (2) by comparing the list of LEONG patients for whom LEONG

billed Medicare and/or Medi-Cal for office visits with the list of individuals from the CURES

database who filled LEONG prescriptions for narcotics (if someone filled a LEONG prescription

for a drug like oxycodone or hydrocodone, but there is no record of an office visit, the

prescription likely reflects illegal distribution); (3) by reviewing the CURES database for

individuals who filled a significant quantity of LEONG prescriptions for oxycodone or

hydrocodone, or who filled a number of such prescriptions in a short amount of time; (4) by

reviewing those individuals who filled LEONG prescriptions outside of California, such as in

Washington, Nevada, and Arizona; and (5) by reviewing those individuals who sent money to

LEONG.

94.     To minimize the possibility of seizing records and other information for

legitimate patients of LEONG, agents further culled the list of Suspect Patients, restricting it only

to those most likely to have filled prescriptions that were not associated with any medical

35

treatment. A list of the "Suspect Patients" about whom evidence is sought in the search warrant is provided as Attachment B-1.

## KNOWLEDGE REGARDING DRUG TRAFFICKERS

95.     It is common for drug traffickers to maintain books, receipts, purchase orders, notes, ledgers, notebooks, and other forms of records specifically relating to their drug distribution activities, in order to account for the transportation, ordering, purchase, manufacturing and distribution of their illegal drugs and the remittance of drug proceeds. Moreover, because drug traffickers will often "front" (that is, sell on consignment) controlled substances to their clients and sometimes be "fronted" controlled substances from their suppliers, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe" sheets and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets. Such records, which are frequently encoded in order to protect those involved in the distribution activities, will often be maintained by drug traffickers on their persons or in their residences, stash-houses, businesses, and/or vehicles so that they are close at hand and readily available for the purposes of ascertaining current balances. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

96.     In the case of LEONG, the fronting and pay/owe sheets referred to above may be associated not only with illegal drugs themselves, but with prescriptions for narcotics such as oxycodone and hydrocodone.

36

97. Drug traffickers frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses and email addresses, sometimes encoded and sometimes not, for the purpose of contacting their suppliers, customers, transporters and others involved in their illicit drug distribution activities, and these records are typically maintained on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

98. Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship illegal drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related Internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, and package tracking records accessed over the Internet, on their person, at their residences, in structures at cultivation sites, stash-houses, businesses, and/or in their vehicles, where they are available for reference. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB

37

or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

99.     In the case of LEONG, the shipping and other services described above may be utilized not only to ship illegal drugs, but to ship prescriptions for narcotics such as oxycodone and hydrocodone.

100.     It is common for drug traffickers to conceal large sums of currency and precious metals, jewelry, wire transfer receipts, cashier checks, money orders, and other financial instruments or items of value which either represent the proceeds from drug sales or are intended for the purchase of controlled substances, including documentation relating to the purchase of real estate and motor vehicles; and when drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug traffickers will use different techniques, sometimes simply by locking large amounts of currency in secured containers immediately available to them, but also by the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate or vehicles, and the establishment of shell corporations and business fronts. They typically keep records of such activity, including accounting books, receipts, bank statements and records (of both foreign and domestic banks), money drafts, letters of credit, money order and/or cashier's check receipts, wire transfers, passbooks, bank checks, and tax returns. Drug traffickers often utilize fictitious or "strawholder" owners and shell corporations to conceal the true ownership and illegal source of real property, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for

controlled substances or make remittance for other costs relating to the distribution of illicit drugs. Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, the trafficking of controlled substances. Those involved in the distribution of drugs typically maintain currency and money counters, precious metals, jewelry, wire transfers, cashiers' checks, money orders, and other financial instruments, as well as records or other evidence relating to financial transactions, income, banking, and expenditures of money and wealth in connection with drug trafficking on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are concealed from law enforcement and readily available. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

101. Those involved in the distribution of illicit drugs often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent-use club membership information, and records and receipts associated with airlines, rental car companies, and/or hotels, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers on their person, in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are readily available for use or reference. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage

media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

102.    Drug traffickers frequently utilize cellular telephones, satellite telephones, pagers and text-messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as Palm and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities, and these items, along with corresponding purchase, service, and billing records, are often maintained on their persons or in their residences, in structures at cultivation sites, stash-houses, businesses, and/or vehicles, where they are readily available. Moreover, such records are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices. Records such as voice mail and text messages, address and telephone number lists and similar data may contain evidence of narcotics trafficking activities as well as the identities of co-conspirators, customers, and suppliers.

103.    Drug traffickers frequently use pre-paid cellular telephones or cellular telephones subscribed in fictitious or "nominee" names. "Nominee" names are names of real persons who are not the trafficker. They may be friends, relatives, or co-conspirators who are aware that the trafficker is using their identity, or they may be innocent persons who are unaware that their identities are being used. Narcotics traffickers frequently employ more than one cellular telephone to conduct their illegal activities. Traffickers use this method to evade law enforcement electronic surveillance as well as to compartmentalize their organizations. Drug traffickers also frequently take, or cause to be taken, photographs and/or videos (which may be

stored as CDs, DVDs, on video cameras, or on portable media such as USB drives, external hard drives, or iPods) of themselves, their criminal associates, their assets (including real and personal property), their weapons, and their drugs, and such items are typically maintained on their persons, in their residences or nearby structures, businesses, and/or vehicles.

104.   Based on my training and experience, I believe that those involved in ongoing, long-term conspiracies to cultivate and distribute illegal drugs such as marijuana often maintain the types of items described above on their person, in their residences, in structures at and near cultivation sites, stash-houses, businesses, and in their vehicles on an ongoing, long-term basis so as to facilitate the conspiracy and prevent detection. Moreover, such items are often stored electronically within the memory of computers, computer-related storage devices (such as USB or "thumb" drives, CD-ROMs, diskettes, external hard drives, iPods, and similar storage media) telephones, pagers, and/or personal digital assistants such as Palm and Blackberry devices.

## ITEMS TO BE SEARCHED FOR AND SEIZED

105.   Controlled substances, such as oxycodone, hydrocodone, and promethazine with codeine.

106.   Records associated with "Suspect Patients" for whom LEONG prescribed controlled substances such as oxycodone, hydrocodone, and promethazine with codeine

107.   Paraphernalia associated with the distribution, sale, storage, conversion, preparation (dilution or cutting) for sale and use of oxycodone and hydrocodone, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, pill bottles, film canisters, laboratory glassware and apparatus such as glass beakers, vacuum flasks, heating mantles, rheostats, rubber hoses and tubing, vacuum pumps, plastic bottles,

filters and funnels, clamps, chemical recipes or formulas, and cutting, conversion, and adulteration agents.

108.    Writings, documents, materials, and records (both paper and digital form) showing evidence of distributing, obtaining, packaging, or shipping oxycodone or hydrocodone or other controlled substances, including prescription pads, books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, pay-owe sheets, spreadsheets, Rolodexes, telephone bills, telephone answering pads, bank and financial records, Western Union receipts and paperwork, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic and international travel (such as airline tickets, itineraries, and passports), and receipts showing travel (such as airline receipts, car rental receipts, hotel receipts, and fuel receipts).

109.    Evidence of distributing, obtaining, packaging, or shipping o xycodone or hydrocodone or other controlled substances or participation in a conspiracy to distribute or obtain oxycodone or hydrocodone or other controlled substances in violation of Title 21 U.S.C § 841 such as may be found in electronic storage devices (and their contents), Personal Digital Assistants (and their contents), pagers (and their contents), cellular telephones (and their contents), telephones and telephone answering machines (and their contents, including tapes and their recorded messages), and other electronic or communication devices (and their contents) or use of such devices. This includes all telephone calls received at the residence during the execution of the warrant, and all incoming pages or calls received on pagers or cellular telephones found during the execution of the warrant.

110.    United States or foreign currency and money wrappers, rubber bands, money containers, and money counting machines.

111.    Financial instruments purchased with large amounts of currency, including travelers checks, bonds, stock certificates, cashiers' checks, certificates of deposit, and money orders.

112.    Records, documents and deeds (both paper and digital form) reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items.

113.    Documents and items tending to establish the identity of persons in control of the premises and things described in this warrant (both paper and digital form), including utility bills, rent receipts, canceled checks, bank and other financial statements and records, deposit receipts, passports, driver's licenses, social security cards, and other identification documents, land and lease titles, escrow papers, photographs, video and audio records, and keys.

114.    Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display obtaining oxycodone or hydrocodone or other controlled substances, firearms, or money and proceeds from narcotics transactions.

115.    The terms "records," "documents," and "materials" include all of the items described above in whatever form and by whatever means they may have been created and/or stored. This includes any photographic, mechanical, electrical, electronic, .and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices, as more fully described below:

> a. Computer Hardware: Computer hardware consists of all equipment
>    which can collect, analyze, create, display, convert, store, conceal, or

43

transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b. Computer Software: Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

44

c. Computer-related Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored records, documents, or material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. Computer Passwords and Other Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

116.   A list of the specific items to be seized from **Subject Premises # 1, # 2,** and **# 3** is attached to and incorporated in this Affidavit as Attachments B and B-1.

117.   Based on my training and experience and the facts set forth above, I respectfully submit that there is probable cause to believe that the items listed in Attachments B and B-1 will be found at **Subject Premise # 1, # 2**, and **# 3**.

45

## INFORMATION REGARDING SEIZURE OF COMPUTERS
## AND RELATED STORAGE MATERIALS

### DEA's Need to Seize Computers and Related Storage Materials

118. Based on my own experience and conversations with other agents, I know that individuals who cultivate and traffic in marijuana often store information regarding those activities on computers and related electronic storage devices. Accordingly, permission is sought herein to seize and search computers and related devices, consistent with the scope of the requested search.

119. The information stored in an electronic format may be found not only on the hard disk drive of a computer, but on other computer hardware, peripherals, and storage media. In order to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware to be searched later by a qualified expert in a laboratory or other controlled environment. This is true for the following reasons:

> a. Volume of Evidence: Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also, when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.

> b. Technical Requirements: Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are

46

so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment needed to conduct a thorough search. In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

c.  Files May Be Hidden, Erased, Compressed, Password Protected, or
    Encrypted: The data search procedures used to recover electronically stored evidence are designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Without knowing the password for encrypted files, it may be impossible to view the information in those files. This is especially true with certain encryption algorithms and/or programs, such as Elgamal, Diffie-Hellman, DSA, and Triple-DES. Even less secure encryption programs may require considerable time or outside agency assistance to decrypt the files absent a password.

d.  Danger of Destruction of Evidence: Computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, both from external sources and destructive codes embedded in the system such as a "booby trap." In order to maintain the integrity of the original evidence, a qualified expert may need to conduct a forensic examination of the storage media in a controlled environment, such as a law enforcement laboratory, where specific procedures and specialized software designed to protect the integrity of the original media will be used.

47

120.    In order to retrieve electronically stored evidence from a computer, agents may be required to seize most or all of a computer system's equipment, including hardware, peripherals, software, documentation, security devices, and passwords. This is true because certain operating systems and hardware can be configured to operate only with a precise set of hardware, software, and peripherals. Peripheral devices that allow users to enter or retrieve data from the storage devices may vary in their compatibility with other hardware and software.

121.    The Computer Forensic Agent may have to install software used by the suspect on a government computer in order to retrieve the information the suspect may have stored using that software. The Computer Forensic Agent may also need to refer to hardware and software documentation maintained by the suspect to complete his/her analysis in a timely manner. The suspect's computer documentation may also contain hand-written notes specific to the seized computer system. Physical keys, encryption devices, and similar items may be necessary to gain access to computer equipment. Passwords, pass-phrases, password files, and similar decryption codes may be required to access specific information stored on the seized computer system.

## **Northern District of California Computer Search Protocol**

122.    Due to the facts outlined above, I request that agents serving this search warrant be authorized to employ the following procedure, which is the standard computer search protocol for the Northern District of California, upon the execution of this search warrant. This protocol is attached as Attachment C.

## **REQUEST TO SEAL SEARCH WARRANT**

123.    I believe that, should the contents of this warrant and affidavit be made public, it would jeopardize this continuing investigation and any personnel assigned to or cooperating in this investigation. I also know, based upon my training and experience, that if the subject of this

investigation or his associates were notified that a criminal investigation exists, they would have the opportunity to destroy evidence, notify co-conspirators, or flee from prosecution. For the foregoing reasons, and because this is an ongoing investigation, I request that the warrant and the accompanying affidavit be sealed until further order of the Court.

## CONCLUSION

124.    Based upon the evidence set forth herein, there is probable cause to believe that Dr. Collin LEONG committed the offenses of distribution of controlled substances, specifically oxycodone and hydrocodone, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846. There is also probable cause to believe that evidence, fruits, and instrumentalities of and property used in committing violations of 21 U.S.C. §§ 846 (conspiracy to possess with intent to distribute controlled substances), 841(a)(1) (distribution and possession with intent to distribute controlled substances); and 18 U.S.C. § 1347 (health care fraud) will be found in the **Subject Premises**.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Jared Lindley
Special Agent, Drug Enforcement Administration

Sworn and subscribed to before me this  23  day of September, 2013

HON. NATHANAEL COUSINS
United States Magistrate Judge

49